IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

WILLIAM GIRLINGHOUSE and
TONI GIRLINGHOUSE                                                                              PLAINTIFFS

V.                                              NO. 6:15-CV-06008-RTD

CAPELLA HEALTHCARE, INC., et al.                                                              DEFENDANTS

**BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

TO THE HONORABLE COURT:

COME NOW Plaintiffs William Girlinghouse and Toni Girlinghouse, by their counsel, and respectfully show the Court as follows:

**I.**

**SUMMARY OF MOTION FOR SUMMARY JUDGMENT**

1. Defendant seeks summary judgment and bases that claim on the idea that Plaintiffs' have no causation evidence linking substandard care to injury to William Girlinghouse.

**II.**

**SUMMARY OF PLAINTIFFS' RESPONSE**

2. It is without dispute that Girlinghouse suffered from a low oxygen state beginning the morning hours of January 30, 3013 and continuing through the afternoon of January 31, 2013 when he was finally intubated in order to correct that condition. It is without dispute that Girlinghouse suffered brain dysfunction from this low oxygen state. His neurologist says the damage became permanent shortly before he was actually intubated, when his oxygen saturation percentage fell into the 60s [normal = 94-98%]. Plaintiffs present

evidence that Defendant's failure to adequately intervene timely is substandard care and causally connected to the injury. Therefore, the motion should be denied.

## III.

## APPLICABLE LAW

3. DEFENDANT'S BURDEN OF PROOF: Summary judgment is only proper when movant proves there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. If the moving party has established a *prima facie* case showing entitlement to summary judgment, the opposing party can defeat the motion by producing evidence demonstrating the existence of a material issue of fact. All evidence must be viewed in the light most favorable to the non-movant; all doubts and inferences must be resolved against the moving party and in favor of the non-movant. *Hamilton v. Allen*, 100 Ark.App. 240, 245, 267 S.W.3d 627, 631 (2007)(*citations omitted*).

4. CAUSATION STANDARD:

   a. Causation in a medical malpractice case "may be shown from circumstantial evidence, and such evidence is sufficient to show proximate cause if the facts proved are of such a nature and are so connected and related to each other that the conclusion may be fairly inferred." *Rose Care, Inc. v. Ross*, 91 Ark.App. 187, 201, 209 S.W.3d 394, 402 (2005), Wal-*Mart Stores v. Kilgore*, 148 S.W.3d 754, 759 (Ark.App. 2004); *See Stecker v.First Commercial Trust Co.,* 331 Ark. 452, 962 S.W.2d 792 (1998).

   b. The testimony of a Registered Nurse is sufficient to support proximate causation in a medical malpractice case. *Ross*, 209 S.W.3d at page 402 ("Brown [RN]'s

opinions, in their entirety, contain substantial evidence from which the jury could have fairly inferred a causal link between [Defendant] Rose Care's conduct and Mrs. Givens's injuries").

## IV.

## BACKGROUND OF MEDICAL AND NURSING ISSUES

5. Girlinghouse was admitted to Defendant's hospital because of symptoms consistent with gallstone pancreatitis – an inflammation of the pancreas caused by the presence of gallstones in the tube that drains fluid from the liver and pancreas into the intestine.[1]

6. Pancreatitis can sometimes cause irritation of the lungs resulting in swelling of the lung tissues and decreased lung function.[2] When this occurs, it can result in a cascade of physiologic changes that, if not interrupted, can lead to full-blown Adult Respiratory Distress Syndrome ["ARDS"] and, sometimes, brain damage or death.[3] This downward course, if not interrupted, can take hours to days, depending on the patient and his specific circumstance. Nursing and medical intervention is designed to interrupt or at least limit this downward course for the purpose of achieving recovery of the patient with a minimum of sequelae.[4]

7. In order to be in keeping with the applicable standards of care for nursing in a hospital such as National Park Medical Center, the nurses are expected to know the physiology of pancreatitis and its association with ARDS.[5] Nurses are expected to know the necessary interventions – or at a minimum understand when the patient needs a higher level of

---

[1] http://www.uptodate.com/contents/acute-pancreatitis-beyond-the-basics [accessed August 8, 2016]
[2] Exhibit A, Affidavit of Toni Girlinghouse; Exhibit B, Nursing Literature
[3] Id.
[4] Id.
[5] Id.

nursing and medical intervention.[6] Nurses are expected to recognize when the pancreatitis patient is trending toward acute lung injury and toward ARDS and understand the evidence-based interventions used to interrupt or ameliorate this downward progression.[7]

8. In order to be in keeping with the applicable standards of care for nursing in a hospital such as National Park Medical Center, the nurses are expected to understand blood gas exchange issues in this kind of patient and understand that when a pancreatitis patient begins suffering impaired gas exchange that is unresolved by supplemental oxygen – and particularly when oxygen saturation continues to decline in the face of increasing supplemental oxygen – the patient requires meticulous hemodynamic and fluid balance control, mechanical ventilation support with lung-protective measures, and nursing interventions designed to decrease the patient's physical and emotional stress and to prevent further injury.[8]

9. In order to be in keeping with the applicable standards of care for nursing in a hospital such as National Park Medical Center, the nurses who have a lower level of training such as LPNs are expected to recognize when the pancreatitis patient is starting to decline and seek assistance from the Charge Nurse and/or her supervising RN.[9]

10. In order to be in keeping with the applicable standards of care for nursing in a hospital such as National Park Medical Center, a Charge Nurse or supervising RN whose attention is drawn to such a patient because of a request by the LPN, complaints of the family members, or because he/she has conducted the required head to toe RN assessment of the

---

[6] Id.
[7] Id.
[8] Id.
[9] Id.

4

patient at the beginning of the shift must intervene as described above in order to get the patient into a higher level of nursing and medical care for the purpose of minimizing the progression of the patient towards ARDS and death.[10]

11. In order to be in keeping with the applicable standards of care for nursing in a hospital such as National Park Medical Center, and with respect to blood gas exchange issues, the nurse is expected to understand the oxygen-hemoglobin dissociation curve and its implications for this kind of patient.[11] The oxygen-hemoglobin dissociation curve is pictured here:[12]



12. In order to be in keeping with the applicable standards of care for nursing in a hospital such as National Park Medical Center, the nurses caring for this kind of patient [as well as the Charge Nurse, the supervising RN and the Nursing Supervisor] must understand the following: the oxygen-hemoglobin dissociation curve shows that as blood oxygen saturation decreases the hemoglobin molecule that carries the oxygen is less able to bind to oxygen. As the curve shows, when blood oxygen saturation decreases below 90% the ability of the hemoglobin to carry oxygen falls precipitously. This is not linear. The

---

[10] Id.
[11] Id.
[12] Id.

5

farther below 90% the oxygen saturation falls, the worse the implications for the patient. Falling oxygen saturation from 88% to 81% is far more alarming for the patient than a drop from 98% to 91%, e.g. For this reason, the nurse should understand that early and aggressive nursing and medical intervention is necessary for this kind of patient when the oxygen saturations drop below 90% and even more so for each incremental drop in oxygen saturation – especially in light of increasing supplemental oxygen.[13]

13. Timely nursing interventions as those described above are shown to improve outcomes and decrease stays in the ICU.[14]

14. In order to be in keeping with the applicable standards of care for nursing in a hospital such as National Park Medical Center, the knowledge that is expected of a nurse regarding this condition and proper nursing interventions are reflected in the nursing literature attached to the affidavit of Toni Girlinghouse.[15]

## V.

## PERTINENT FACTS

15. Girlinghouse's wife, Toni, is a licensed RN with a Bachelor of Science in Nursing and is qualified to speak to the standards of care applicable to patients such as her husband. Registered nurses are qualified to recognize respiratory distress and hypoxia.[16] It should be noted that Dr. Shah was deposed on May 21, 2013, which was after both Toni Girlinghouse[17] and Dorothy Cooke[18] were deposed. Similarly, Donald Brady, MD was deposed on May 20, 2016. As opinion witnesses, Toni Girlinghouse and Dorothy

---

[13] Id.
[14] Id.
[15] Id.
[16] Id.; Exhibit C, Deposition of Siddarth Shah, MD at page 46
[17] Toni Girlinghouse was deposed on November 16, 2015
[18] Dorothy Cooke was deposed on May 16, 2016

6

Cooke's have taken Brady and Shah's testimony into account, including information that was unknown until the Brady and Shah depositions were accomplished. For example, Dr. Shah's testimony referenced in paragraph 19(l) and footnote 55, below, was unknown at the time of the Cooke and Girlinghouse depositions.

16. Prior to the January 2013 admission to National Park Medical Center ["NPMC"], William Girlinghouse ["Girlinghouse"] had normal mental function/cognition.[19] On admission, his breathing status was in the normal range with 94% blood oxygen saturation on room air, and in no acute distress.[20]

17. Girlinghouse's medical history is not unusual for a patient in the Hot Springs area.[21] His medical condition made him more vulnerable to the effects of things such as low oxygen ["hypoxia"].[22]

18. During the morning hours of January 30, 2013, Toni Girlinghouse, RN (who had spent the night in her husband's room) awoke to find a nursing assistant in the room taking a blood oxygen reading that showed he was down to approximately 83% - despite an increase in his supplemental oxygen to 6 liters per minute. She spoke with the patient and he had an altered mental status and wasn't making sense.[23] He said he couldn't breathe and wanted to go outside to catch his breath and get some fresh air.[24] The tip of his nose was turning blue.[25] From that point forward, Toni Girlinghouse repeatedly requested – later demanded – that the nurse get a doctor to evaluate this patient – but to no avail.[26]

---

[19] Exhibit A, Affidavit of Toni Girlinghouse, RN, BSN; Exhibit D, Deposition of Donald Brady, MD at page 54 (there is no data or evidence of brain dysfunction prior to this admission to the hospital)
[20] Exhibit C, Deposition of Siddharth Shah, MD at page 18
[21] Exhibit D, Deposition Donald Brady, MD at page 57
[22] Id. at page 59; see also Brady's qualifications as a neurologist at pages 4-6 and 84-85
[23] Exhibit A, Deposition Toni Girlinghouse RN, BSN at page 83, *et seq.*
[24] Id.
[25] Id. at page 85
[26] Ibid.

7

19. William Girlinghouse suffered from hypoxia throughout the day of January 30, 2013 and until he was intubated the afternoon of January 31, 2013.[27] During this time, the hypoxia was not being adequately addressed.

   a. For example, at 4:40 a.m. on January 30, 2013, Girlinghouse's supplemental oxygen was turned up by unknown hospital staff presumably to maintain an oxygen saturation of 90%.[28] This increase in oxygen need is consistent with deterioration of his respiratory status according to NPMC respiratory therapist Katy Oliver.[29]

   b. Toni Girlinghouse awoke in the hospital room that morning to find her husband in a low oxygen state, manifesting in blue tinge to his skin color and an altered mental state.[30] At the time she awoke his supplemental oxygen had been increased to 6 liters per minute but his blood oxygen saturation had decreased to only 83%.[31]

   c. Toni Girlinghouse demanded the nurse [Nurse Feimster] call the doctor but the nurse did not do so.[32]

   d. William Girlinghouse's low oxygenation continued throughout the morning -- meanwhile Toni Girlinghouse had to be at work at noon because she was Supervisor of the Operating Room at St. Vincent's Infirmary Medical Center in Little Rock and was unable to simultaneously stay and keep her job. Girlinghouse

---

[27] Exhibit A, Affidavit of Toni Girlinghouse, RN, BSN
[28] Id.
[29] Exhibit E, Deposition of Katy Oliver at pages 32-34
[30] Exhibit A, Deposition of Toni Girlinghouse RN, BSN at page 84-85
[31] Id. at pages 83-84
[32] Exhibit A, Affidavit of Toni Girlinghouse, RN, BSN

8

    instructed the nurse to get a doctor for William and she would follow-up after she got to work.[33]

e. Throughout the day, Toni Girlinghouse and her daughter Angela Girlinghouse spoke to hospital staff and William Girlinghouse on the phone periodically and confirmed he had continued altered mental state consistent with ongoing hypoxia[34] meanwhile the hospital staff did not call a doctor in to address this problem.[35]

f. The afternoon of January 30, 2013, Girlinghouse's daughter Amy went to Girlinghouse's room while on the phone with her sibling, Angela.[36] Upon walking in the room, Amy exclaimed "Oh my God! He's blue!"[37] indicating continued hypoxia.

g. At 5:30 pm respiratory therapist Trishi McCaslin was summoned to Girlinghouse's room and observed him to be "in distress, and [she tried] to keep his oxygen level up."[38] She did an arterial blood gas test "for respiratory distress" to more accurately measure his blood oxygen drawn,[39] revealing a blood oxygen of only 81% while on 15 liters per minute of oxygen; it also showed that Girlinghouse was acidotic with a pH of 7.31 [normal range = 7.38-7.42].[40] Acidosis is a pH change in the blood that indicates the body is being stressed in its ability to function without oxygen.[41] McCaslin saw Girlinghouse's oxygen level

---

[33] Id.
[34] Id.
[35] Id.
[36] Exhibit F, Deposition of Angela Girlinghouse at page 32
[37] Id.
[38] Exhibit G, Deposition Trishie McCaslin at page 44
[39] Exhibit G, Deposition Trishie McCaslin at page 46
[40] See Exhibit H, ABG report with blood drawn at 1810 hours bates no. NPMC-WG.000464
[41] Exhibit D, Deposition Donald Brady MD at page 71-72

was low and that he couldn't breathe.[42] She gave him two breathing treatments.[43] She was unable to keep his blood oxygen above the minimum 90% even on 15 liters per minute of supplemental oxygen,[44] which she opines is "pretty bad."[45]

h.  Shortly thereafter, respiratory therapist Katy Oliver came to Girlinghouse's room and saw that he was blue and very short of breath, which to her meant "[h]e's in trouble because he's blue."[46] According to Oliver, she is trained to know that continued low oxygen will eventually have bad side effects that include damage to the brain and other organ systems.[47]

i.  According to Oliver, Girlinghouse was in a deteriorated condition at this time and his pulmonologist, Siddarth Shah, MD was unaware that this had occurred.[48] She felt like the patient needed to be moved to the ICU.[49] Oliver was "so concerned for him and so scared because he was blue" and "he looked so bad."[50] She worked with the patient and was able to get his color back and his oxygen level up.[51]

j.  Dr. Shah testified that he has no evidence he was called for this patient until this incident that occurred at 6:10 p.m. on January 30, 2013.[52] He evaluated the patient at around 6:40 pm and saw Girlinghouse had improved somewhat as compared to the crisis situation reflected by the ABG report.[53]

---

[42] Exhibit G, Deposition Trishie McCaslin at page 48
[43] Id. at page 51
[44] Id. at page 59
[45] Id. at page 64
[46] Exhibit E, Deposition of Katy Oliver at page 56
[47] Id. at pages 38-41
[48] Id. at page 59
[49] Id. at pages 61, 67
[50] Id. at pages 64-65
[51] Id.
[52] Exhibit C, Deposition Siddarth Shah, MD at page 43
[53] Id. at pages 43-44

    k. Girlinghouse was moved to the ICU later that evening.[54]

    l. Dr. Shah has no evidence that any nurse called him about Ron Girlinghouse's continuing respiratory difficulties that night, even though the medical records show Girlinghouse continued to desaturate down to the 80s and, the next morning, into the 60s.[55]

    m. Around 11:28 a.m. the next day [January 31], the ICU nurses called Dr. Shah to notify him of the need to intubate Girlinghouse.[56] Toni Girlinghouse asked for enough time to call the children so they could speak to the patient, fearing that he had deteriorated so much he would never get off the ventilator.[57] Shah describes Girlinghouse on the 31st as "very critical"[58] (representing a deterioration from the evening of the 29th when Shah described Girlinghouse's condition as merely "guarded."[59]) Afterwards, Girlinghouse was intubated.[60]

    n. Had Dr. Shah been called at 6 or 7 a.m. on January 31, 2013 and confirmed the patient was unable to maintain adequate oxygenation he would have probably intubated at that time.[61]

    o. As a result of the hypoxia, Girlinghouse suffered brain dysfunction that became permanent damage when his oxygen saturations fell to the 60s on the 31st.[62]

---

[54] Exhibit I, Nursing Record bates no. NPMC-WG.000504
[55] Exhibit C, Deposition Siddarth Shah, MD at page 74; Medical records
[56] Nurses Notes Bates No. NPMC-WG.000506 ("Dr. Shah in unit notified of need to intubate secondary to physical presentation and $O_2$ sat")
[57] Exhibit J, Deposition Toni Girlinghouse, RN, BSN at page 97
[58] Exhibit I, Medical record bates no. NPMC-WG.000149
[59] Id. at bates no. NPMC-WG.000143
[60] Exhibit I, Medical record Bates No. NPMC-WG.000507
[61] Exhibit C, Deposition Siddarth Shah, MD at pages 79-80
[62] Exhibit D, Deposition Donald Brady, MD at page 70; Exhibit K, Brady Medical Records (which were also attached to his deposition as Exhibit 1 to the deposition)

20. After the incident described above, Girlinghouse displayed signs/symptoms/findings of a brain injury. So, a neurologist named Donald Brady, MD was summoned.[63] Brady evaluated Girlinghouse and ultimately diagnosed a brain injury. Brady documented in his office records: "I saw [Girlinghouse] as an inpatient in 2013, at which time he had suffered a global hypoxic-ischemic insult, resulting in global cognitive dysfunction, initial obtundation, and generalized confusion."[64] He also wrote, "[Girlinghouse has] [s]tatic hypoxic-ischemic encephalopathy[65] related to period of relatively severe hypoxia in 2013."[66]

21. Brady describes these medical terms in his deposition as follows:[67]

> Hypoxic-ischemic insult is simply an episode or a problem with significant hypoxia, problems with somebody's breathing, you know, somebody has a cardiopulmonary arrest, for example, or their respiratory function is deteriorating to such an extent that they become severely hypoxic and need to be on the ventilator or something of that sort. An ischemic insult, generally talking about periods of relative or severe hypotension, again, something like that cardiopulmonary arrest or sepsis or other kinds of situations like that where there was severe hypotension and loss of cerebral perfusion pressure; loss of brain circulation.

22. Brady states that the "severe hypoxic event" refers to the period of hypoxia that is the subject of this lawsuit culminating with the patient's intubation on January 31, 2013,[68] which occurred at 2:20 p.m.[69]

23. While Brady says there was hypoxia in this patient during the time period complained of,[70] he thinks the brain damage became permanent when the oxygen saturations got

---

[63] Exhibit D, Deposition Donald Brady, MD at pages 53-54
[64] Id. at pages 18 & 41; Exhibit K
[65] Exhibit D, Deposition of Donald Brady, MD at page 63, line 1 (hypoxic-ischemic encephalopathy means brain damage caused by low oxygen and low blood flow)
[66] Ibid.
[67] Exhibit D, Deposition Donald Brady, MD, at page 23, line 12
[68] Id. at pages 34 & 64
[69] Exhibit I at bates no. NPMC-WG.000507
[70] Exhibit D, Deposition Donald Brady, MD at page 34

down into the 60s.[71] According to the medical records, the first dip in blood oxygen saturations to the 60s was at 9:00 a.m. on January 31, 2013.[72] According to Brady, intubation prior to the time the saturations went to the 60s would have likely prevented permanent injury.[73]

24. According to Brady, the brain injury Girlinghouse suffered is permanent.[74]

25. SUBSTANDARD NURSING AND HOSPITAL CARE: The nursing staff was substandard in their management of this patient beginning the morning of January 30, 2013 and extending through the morning of January 31, 2013. The failures include failure to adequately and timely respond to an adverse change in the patient's condition and failure to advocate for more aggressive treatment for his respiratory status to include ICU admission the morning of January 30, which ultimately resulted in a profoundly weakened patient and delay in definitive control of his airway [ie, intubation]. Intubation was indicated on the 30th.

   a. DOROTHY COOKE, RN, PhD, CS, APN:

      i. Plaintiffs retained Dorothy Cooke to review the care and treatment rendered to William Girlinghouse by Defendant. In Dr. Cooke's opinion the nursing staff was negligent in the following respects:

      ii. A patient like Mr. Girlinghouse should have been assigned an RN to manage his care and not an LPN like Marilyn Feimster, because his condition required at a minimum a registered nurse level of care.[75] This is

---

[71] Id. at page 70
[72] Exhibit I, at bates no. NPMC-WG.000505; see also bates no NPMC-WG.000149
[73] Exhibit D, Deposition Donald Brady, MD at page 70
[74] Id. at page 67
[75] Exhibit M, Affidavit of Dorothy Cooke RN, PhD, CS, APN

13

       substandard care by the Charge Nurse who did the patient care assignments on January 30, 2013.[76]

  iii. Intubation of William Girlinghouse was needed on the 30th.[77]

  iv. Cooke says nurses are qualified to interpret arterial blood gas tests.[78]

  v. Cooke says that the floor nurse on January 30, Marilyn Feimster, LPN, was negligent by failing to timely respond to the reports of the patient's family regarding his change in respiratory and mental status. Cooke described Feimster's conduct as "clinically clueless."[79] Feimster wholly failed to evaluate the patient at all on the 30th for mental status changes.[80]

  vi. Cooke says that Defendants' Director of Nurses Patsy Crumpton failed to empower the floor nurses to advocate for their patients as evidence by the fact that the floor nurse for Girlinghouse failed to advocate for him in any manner whatsoever.[81]

  vii. Cooke says that it was substandard care on the 30th when an RN failed to perform/document a head to toe assessment of Girlinghouse, especially in light of the respiratory and mental state changes reported by the family.[82]

  viii. Cooke believes that the nursing staff fell below applicable standards of care in managing William Girlinghouse by failing to adequately respond to signs of deterioration and failure to advocate for him and ensure ICU admission and meticulous management of his clinical condition for the

---

[76] Id.
[77] Exhibit L, Deposition Dorothy Cooke with CV, at page 126
[78] Id. at page 131
[79] Id. at page 153
[80] Id. at pages 106-107
[81] Id.
[82] Id. at page 101

14

     purpose of preventing or limiting his deterioration with evidence-based interventions.[83]

  ix. In Cooke's opinion, had the nursing staff acted appropriately, Girlinghouse would likely have been intubated the night of January 30, 2013; failing that, he would have at the least been intubated in the early morning hours of January 31, 2013 prior to his oxygen saturations falling to the 60s.[84]

  x. In Cooke's opinion, and in light of Donald Brady, MD's testimony targeting the onset of permanent brain injury etc., the substandard of care was a proximate cause of Girlinghouse's brain injury because intubation would likely have occurred prior to Girlinghouse's oxygen saturations falling to the 60s on the 31st but-for the substandard nursing care.[85]

b. TONI GIRLINGHOUSE, BSN, RN: Toni Girlinghouse is a licensed RN, with a Bachelor of Science in Nursing, who is qualified by training and experience to opine on the standards of care for a patient such as William Girlinghouse.[86] In her opinion, the nursing care provided to William Girlinghouse by Defendant's nurses fell below applicable standards of care in the following ways:

  i. Nurse Feimster failed to do a head to toe assessment of William Girlinghouse the morning of January 30, 2013;[87]

  ii. Nurse Feimster failed to appreciate deterioration of respiratory status and mental status changes the morning of January 30, 2012;[88]

---

[83] Exhibit M, Affidavit of Dorothy Cooke RN, PhD, CS, APN
[84] Id.
[85] Id.
[86] Exhibit A, Affidavit of Toni Girlinghouse, RN, BSN
[87] Id.

15

    iii. Nurse Feimster failed to assure that a pulmonologist was summoned for an urgent evaluation of William Girlinghouse beginning the morning of January 30, 2013 and continuing throughout the day;

    iv. Nurse Feimster failed to advocate for/assure ICU admission for William Girlinghouse on January 30, 2013 -- using the hospital Chain of Command Policy to accomplish that, if necessary;[89]

    v. The ICU nursing staff on January 31, 2013 should have called Dr. Shah to intubate the patient at the first indication his oxygen saturation would drop to the 60s (while the patient was taking his medication at around 9:00 a.m.); they should not have waited until 11:28 a.m. They should also have informed Toni Girlinghouse of this development as well so the conversation about intubation that occurred after 11:28 would have begun at 9:00 a.m. Failing to do these things was substandard nursing care;[90]

    vi. Had the nurses acted within the standard of care, William Girlinghouse more likely than not would have been intubated prior to his oxygen saturations dropping to the 60s during mid-day January 31, 2013 perhaps as early as January 30, 2013;[91]

    vii. If the standard of care had been met by Nurse Feimster, her Supervising RN, and the Nursing Supervisor, this patient would most likely have been evaluated the morning of January 30, 2013 and moved into the ICU by

---

[88] Id.
[89] Id.
[90] Id.
[91] Id.

16

      mid-day.[92] If the standard of care had been met, these nurses [as well as the ICU nursing staff] would have assured that meticulous fluid management would have occurred [the MD note of January 30, 2013 indicated possible fluid overload], meticulous hemodynamic management would have occurred and – if those efforts proved unsuccessful – the patient would more likely than not have been intubated by the evening of January 30, 2013 or the early morning of January 31, 2013.[93]

  viii. Because of the failures of nursing care, the interventions that ultimately occurred were delayed by at least 24-hours and until a time when the patient was exhausted and his condition, as described by the MD staff, went from "guarded" to "very critical."[94]

    ix. Toni Girlinghouse, as one might imagine, was extremely upset and concerned for her husband and should never have been put in the position of trying to manage his nursing care in addition to the emotional issues of grieving for one's spouse.[95] Had proper nursing care been provided, as outlined above, the necessary conversations and consent issues would most likely have been resolved the evening of the 30th and the patient intubated then – long before the patient's oxygen saturations reached the 60s on the 31st.[96]

26. EPIDEMIOLOGY ANALYSIS OF CAUSATION: Seeking more data on the causation issue, Plaintiffs sought an epidemiology analysis; to wit, Plaintiffs retained

---

[92] Id.
[93] Id.
[94] Id.
[95] Id.
[96] Id.

epidemiologist Michael Freeman to analyze the odds ratios between pancreatitis and any association with Adult Respiratory Distress Syndrome and/or hypoxic brain injury.[97]

   a. The analysis was conducted using standard epidemiological methods using data from the US Government's National Inpatient Sample that is part of the US Healthcare Utilization Project – the largest and most reliable collection of data on inpatient hospitalizations in the USA.[98]

   b. The analysis revealed that given standard medical care, among patients admitted for hospitalization with a diagnosis of pancreatitis, only 4.8% went on to develop full-blown Adult Respiratory Distress Syndrome ["ARDS"], and of that subset only 3.8% of those patients went on to develop a hypoxic brain injury. Thus, with standard care, most patients admitted for pancreatitis do not go on to develop ARDS, and most of those patients do not end up with a hypoxic brain injury.[99]

   c. Among the patients admitted for pancreatitis who developed ARDS, if the patient also went on to be diagnosed with a hypoxic brain injury, the patient more likely than not also was assigned a "medical misadventure" diagnosis code.[100]

   d. Among all patients admitted for pancreatitis, if the patient is also diagnosed with a hypoxic brain injury, it is three-times as likely that the patient is also assigned by a "medical misadventure" diagnosis code.[101]

   e. The analysis shows that given standard medical care a patient admitted with pancreatitis more likely than not does not go on to ARDS and brain damage.[102]

---

[97] Exhibit N, Deposition of Michael Freeman at pages 93-94 and CV
[98] Id. at pages 94-97
[99] Id. at page 84
[100] Id. at page 47
[101] Id. at page 71
[102] Id.

18

27. Putting this information together, we know by medical testimony that this patient's brain injury occurred somewhere around mid-day on January 31, 2013 and that it most likely would have been prevented by intubation prior to that time. We also know that the nursing care was substandard and that but-for that substandard care two things occurred: a) the patient's condition was allowed to worsen on a continuing progression from lung injury to frank ARDS and then to brain damage due to delay in early nursing and medical intervention, and b) the patient most likely would have been intubated prior to mid-day on January 31, 2013 (when permanent brain damage occurred) – likely as early as the evening of the 30th.



The nursing negligence took the patient from "guarded" to "very critical" condition and needlessly delayed the interventions that would have prevented the brain injury. This, as well as the other data above, is substantial evidence of causation – both circumstantial and direct – that is sufficient to defeat summary judgment.

19

FOR THESE REASONS, Defendant's Motion for Summary Judgment should be denied.

        Respectfully submitted,

        THE GIRARDS LAW FIRM
        10,000 N. Central
        Suite 400
        Dallas, TX 75231
        PHONE:  (214) 346-9529
        FAX: (214) 346-9532
        E-MAIL:  jim@girardslaw.com

          /s/ James E. Girards
By _____
        James E. Girards, AR Bar No. 2006017
        *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

Mr. David P. Glover
WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699

          /s/ James E. Girards
        _____
        James E. Girards